THE JEFFERSONVILLE RAILROAD COMPANY· *v.* SWIFT.

RAILROADS.—INJURY TO PASSENGERS.—Where a passenger voluntarily leaves a train of cars while in motion, simply to avoid being carried beyond the station where he desires to stop, and in doing so receives an injury, his own negligence is the proximate cause of the injury, and he cannot recover against the company, though the conductor was also in fault in not stopping the train.

SAME.—Nor is it sufficient to charge the company in such case that the conductor advised the passenger that he could safely jump from the train.

SAME.—*Quære*, whether there could be a recovery if it appeared that the passenger left the train in pursuance of the direction or command of the conductor.

INSTRUCTIONS.—Instructions based on a hypothetical case, when the evidence does not tend to make the case supposed, are out of place, and ought not to be given.

APPEAL from the *Johnson* Circuit Court.

ELLIOTT, J.—This was a suit by *John Swift* against *The Jeffersonville Railroad Company* to recover damages for injuries sustained by the former in leaping from the cars of the company, on which he was a passenger, while they were in motion.

The complaint contains two paragraphs. The first alleges, in substance, that *Swift* took passage on the cars of the road at *Jeffersonville*, on the 7th of *February*, 1865, for *Amity*, *Johnson* county, *Indiana*, and paid his fare on the contract of the company to carry him safely to, and put him safely off at, *Amity*; that the company carelessly ran by the station at *Amity*, and did not stop to enable him safely to leave the cars, whereby it became necessary for him to leave them while they were in motion, to avoid being carried on to the next station, which he did, and thereby received the injuries for which he sues.

The second paragraph is like the first, except, that it alleges that when the train was passing *Amity*, the " conductor only checked said train of cars to about one-third the usual speed thereof, and told and directed said plaintiff to

jump off and leave said cars, and that he could safely do so; and said plaintiff, while at and passing the place last aforesaid (*Amity*,) on said cars, possessing good health, strength and activity, for a man of his age, but having no experience or acquaintance as to the safety or peril of jumping from or leaving cars while in motion, but relying and depending upon the experience, judgment and skill of said conductor for so doing," and believing the speed of the train would not be further diminished, did, when told by the conductor, as cautiously as he could, under the circumstances, jump off, whereby he was injured, &c.

To each paragraph of the complaint the defendant filed a separate demurrer, on the ground that neither of them contained facts sufficient to constitute a cause of action; but the court overruled the demurrers, to which ruling the defendant excepted. The defendant then answered by a general denial.

The jury to which the cause was submitted for trial returned a general verdict for the plaintiff, and assessed his damages at $5,000. They also returned certain special findings, in answer to the interrogatories submitted to them by the court, which will be noticed in another part of this opinion.

The defendant's counsel moved the court for a new trial, for reasons filed in writing, which the court overruled. He also moved for a judgment for the defendant on the special findings of the jury, which motion was also overruled. He then moved in arrest of judgment, which the court overruled, and gave judgment for the plaintiff on the verdict of the jury. To all of which rulings the defendant excepted.

The evidence and instructions of the court to the jury are made a part of the record by a bill of exceptions. Errors are assigned upon the action of the court in overruling the demurrer to the complaint; upon the instructions given by the court to the jury, and the refusal to give certain instructions asked by the defendant, and upon the action of

the court in overruling the motions for a new trial and in arrest of judgment.

The first paragraph of the complaint we think is clearly bad. It admits that the plaintiff voluntarily leaped from the cars while they were in motion—running at the rate of one-third their usual speed—and by reason thereof received the injuries complained of, and the only excuse alleged for this extremely imprudent and perilous act is, that the train was being run past *Amity*, where he wished to leave it, and where it was the duty of the conductor to stop the train and let him off. These facts, however, do not afford a justification for so rash an act as that of leaping from the train when in motion. *Jeffersonville Railroad Company* v. *Hendricks Adm'r ante* p. 228. Admitting that those having charge of the train, in negligent disregard of their duty, were running it past the station, and that they did not intend to stop there, still, the paragraph shows that the injury to the plaintiff was the immediate result of his own imprudent and rash conduct; and there is no principle of the law more clearly settled, or more universally recognized by all the courts, than that in suits for such injuries, though the defendant may have been guilty of negligence, yet if the plaintiff's own want of reasonable care and caution directly contributed in producing the injury, he cannot recover. This principle has been so often announced by this court that a reference to the cases is unnecessary. The court so charged the jury in this case.

It is evident, however, from the evidence in the case, the charge of the court, and the special findings of the jury, that the verdict for the plaintiff was based on the allegations of the second paragraph of the complaint. We are not satisfied that the facts alleged in the second paragraph of the complaint constitute a cause of action; but without passing upon that question, and assuming the paragraph to be good, we pass to the evidence given to the jury, the charge of the court and the special findings of the jury, which more clearly and directly present the questions involved in the case.

It was in evidence, and not controverted, that *Swift* and one *Ford*, his son-in-law, residents of *Kentucky*, took the cars on the defendant's road at the time stated in the complaint, at *Jeffersonville*, as passengers for *Amity*, on said road, in *Johnson* county. The train contained seven or eight passenger cars, and *Swift* and *Ford* were in a car about the middle of the train, most probably in the third one from the rear end of the train. As the train approached *Amity*, they went upon the platform of the forward end of the car they had occupied, and as that car was passing the station platform, *Ford* leaped from the car upon the station platform and was not injured. Soon afterwards, and when the forward end of that car had passed the north end of the station platform from fifteen to thirty feet, *Swift* also jumped off, was thrown violently upon the ground, the cars still being in motion, and was seriously injured in the hip. *Amity* was only a signal station, and the trains on the road only stopped there when signaled. If passengers were to get on the train at that station, the fact was signaled by the engineer to the conductor by a whistle from the engine, and if passengers were to get off the train there, that fact was signaled by the conductor to the engineer by a ring of the bell. The station platform at *Amity* was about one hundred feet long, and the length of the train between five hundred and six hundred feet. The train did stop very soon after *Swift* jumped off, but whether before or just after the rear car had passed the station platform, is a question about which there is some conflict in the evidence.

*Swift* was a witness on the trial, and testified on his own behalf. And as the questions for our decision are made to arise more particularly upon the facts testified to by him, we copy into this opinion all that part of his evidence having reference to his jumping off the cars when in motion, and his reasons therefor. It is as follows: "I was not acquainted with the conductor before that trip, but he passed and repassed in the cars until I got familiar with his face, but I don't know his name. I kept my seat all the trip until at

*Amity.* As we were approaching *Amity*, the first notice I had of the fact was from Mr. *Ford*, who informed me that I must be in readiness to get off, as the train was not in the habit of stopping entirely. I got up and went to the door of the car, where I saw the conductor on the platform of the car, and I think I stepped outside. This was at the moment the car passed the platform. I saw a platform; but don't think it was a long one. I do not recollect to have heard a whistle or the ringing of the bell. The train was running at not far from half speed. Think the train was running at ten or twelve miles per hour when it passed the platform. My traveling companion left me by jumping on the platform, and my first impulse was to jump too, but I felt afraid, and said to the conductor, probably a little irritated, 'Mr., I cannot make this risk,' and I think he spoke in an irritated manner, 'you could if you would,' or 'you might if you would.' I am not certain which, but think it was the former. This was the same man who had acted as conductor all day, and who had taken up my ticket, and my impression is that the conductor and some others, perhaps a brakeman, were the first to get to me; they raised me up, and I became very sick, and told them to lay me down, which they did, and went on. I don't think the hindmost car had passed me when the train stopped. I thought when I jumped, as I was an active man, I would, considering what the conductor had said, make a safe jump, and expected to land five or six feet from the cars, but by some means I jumped close to the cars, and for the moment supposed I was on the rail, and I suppose the conductor thought so too. * * * It was a very short space of time between *Ford's* jumping off the train and my jumping. I think I jumped in a little excavation. It was a very light night; could see almost as well as in day time. A little snow was on the ground at the time. I neither saw nor heard any evidence of stopping the train. I saw a brakeman standing by the door, but he made no sign of applying the brakes. My impression

is that there were no other persons on the platform of the car, except myself, *Ford*, and the conductor. Two or three came up after the conductor left me on the ground, and picked me up. One was *Ford*. *Ford* was not hurt. My impression is that the train was not running so fast when I jumped as when *Ford* did so. Had I thought otherwise I would not have jumped. I think it was up grade there."

On cross-examination the witness said: "This was perhaps the first time I ever traveled on the road. Never saw the conductor before that trip. I had no communication with the conductor other than to show him my ticket. I thought when I leaped from the car that I would leap five or six feet, but was mistaken. The fall knocked the breath out of me; but I think my mind was good when I was raised up. I don't think the train stopped to exceed a minute at *Amity*. I think I was close to the rear car, in it, or in the one in front of it. Mr. *Ford* was in the same car with me. *Ford* jumped out without damage. I think the cars were running at the rate of ten or twelve miles per hour. When the train stopped I think the rear car was a little beyond me, but I cannot tell how far I was from the platform, nor how far the car had passed the platform when it stopped. It must have been a very short time after *Ford* jumped when I jumped. I thought the cars were going slower when I jumped than when *Ford* jumped. I have formed my opinion of the speed of the cars more from what people tell me than from what I know myself. I never saw the conductor since, so far as I know. Just at or close to the station, at *Amity*, I got up to go out. I saw the brakeman near the brake, but don't think he was making any effort at the brake. Did not examine the brake, and can't tell whether it was tightened up or not. I did not know the man who was standing there, and can't say whether he was a brakeman or not."

On re-examination the witness said: "When I jumped from the car I was on one of the steps, but not the lowest,

perhaps the middle. I jumped from the front end of the particular car I was on."

The court, upon its own motion, instructed the jury as follows :

1. " The defendant, as a carrier of passengers, is not an insurer of their safety, but is bound to use the highest degree of care in conveying them safely, and as far as competent skill and human foresight can go, must take due care in the performance of its duty."

2. " The defendant is liable to a passenger for any injury he may sustain by reason of the want of skill, want of foresight, or the misconduct of its agents or employees."

3. " The company, however, is not liable for the misconduct or carelessness of others on the train than its servants or employees, such as other passengers and the like, nor for an injury resulting from the carelessness of the plaintiff himself; and though the conduct of the defendant's servants may have been deficient in perfect thoughtfulness and care for the safety of the plaintiff, on the occasion when the injury was received, yet if the carelessness and imprudence of the plaintiff contributed to the injury he received, the defendant is not liable."

4. " If, for example, when the train upon which the plaintiff was, arrived at *Amity*, and before it stopped at the usual place of stopping at that depot, the plaintiff, of his own motion, and without any advice, command or direction from the defendant's servants, leaped from the car while in motion, and if thus to leave the car at such a time was calculated to endanger him, and did occasion the injury complained of, the plaintiff ought not to recover, because, in such a state of facts, he would as much contribute to the injury as the defendant did."

5. " If the plaintiff paid for a passage on the defendant's train of cars, from *Jeffersonville* to *Amity*, it was his right to be delivered safely at the latter place, and with reasonable time to alight at the depot; and if the defendant's servant's.

neglected or refused.to allow him sufficient time so to alight, with his baggage, they committed a wrong towards him, for which his remedy was to remain upon the cars until he could safely alight, and then to prosecute the defendant for the damage he may have sustained by being carried past the point of destination first agreed upon, and paid for; but if the plaintiff, rather than thus remain upon the train, preferred to leap therefrom, on their refusal or neglect to stop, and if such leap contributed to the injury he suffered, he cannot recover in this action."

6. "But if the plaintiff, laboring under the impression, derived from the information of passengers and officers of the company, that the train did not stop at that station, and if he had been told by defendant's conductor that it was safe to leap from the cars while in motion, and was told, advised or commanded so to leap, and if with such assurance of the safety of the leap, and relying thereon, he did attempt to get off the train while it was in motion, and thereby received the injury, the defendant would be liable for the injury thus received under such misdirection of their agents."

To the giving of each of these instructions the defendant excepted, and at the proper time asked the court to give the jury the following instructions, viz:

1. "If the plaintiff jumped from the car of the defendant while the train, of which said car was a part, was in motion, without being directed or advised to do so by the conductor in charge of the train, and to avoid no other damage, peril or inconvenience than might result from his being carried beyond the station at *Amity*, to which he had purchased a ticket, and where he was to leave the cars, by which jumping off the injury sued for in this case occurred, and the said train did actually stop at said station, or so near it as not materially to inconvenience the plaintiff, long enough for the plaintiff to have stepped off in safety, pursuant to the regular signals between the conductor, engineer and brakemen, the plaintiff cannot recover."

2 "If the plaintiff leaped from the car while the train was in motion, believing his activity would enable him to do so safely, and acting in part upon that belief, having previously determined to do so if the train did not stop, and partly upon the advice and direction of the conductor in charge of the train, to avoid no other peril, inconvenience or damage than that of being carried past the station at *Amity*, which he was apprehensive, from information before received from a fellow passenger, might happen if he did not so leap off, and the conductor had not before told him the train would not stop, and he did not before leaping off ask the conductor whether the train would stop or not, and the train actually did stop at the station of *Amity*, or near it, say within one hundred feet, long enough for the plaintiff to have stepped off the car in safety, and such stopping was in pursuance of regular signals previously given, the plaintiff cannot recover in this suit for the injury he received by such leaping off."

The court gave the first of said instructions and refused the second, but gave in lieu of it the following, viz:

"If in leaping from the car while the train was in motion, the plaintiff, though assured by the conductor of the train that it was safe to do so, yet made the leap, not upon the strength of that assurance, but upon his belief in his own ability to do so, and if he made that leap to avoid no other peril, inconvenience or damage than that of being carried past the station at *Amity*, which he had been informed by a fellow-passenger might happen if he did not so leap, and if he had not been told by the conductor in charge of the train that the train would not stop, and if in fact the train did stop at *Amity* long enough for him to have gotten off in the usual manner in safety, said stopping being in pursuance of regular signals previously given, in such a state of facts the plaintiff would have been the principal cause of his own injury, and ought not to recover."

To the refusal of the court to give the second instruction

asked, and to the action of the court in giving the substitute, the defendant excepted.

The interrogatories propounded to the jury, and the special findings in answer thereto, are as follows:

1. "Was the injury for which the plaintiff sues in this case received by leaping off a car of the defendant while the railroad train of which the car was a part was in motion?"

Answer—"Yes."

2. "Did the plaintiff leap from said car to avoid, as he supposed, being carried past the station at *Amity?*"

Answer—"Yes."

3 "Did the conductor in charge of the train direct or advise him so to jump off?"

Answer—"Yes."

4. "Did the train, from a car of which he thus leaped, stop at the *Amity* station, the rear car being, when stopped, alongside the platform, long enough for him to have stepped off in safety, had he remained in the car until it stopped, said stopping being pursuant to regular signals given previous to the leaping off of the plaintiff?"

Answer—"To the fourth question above, we think the preponderance on the question not sufficient for 'yes,' and we answer 'no.'"

In reference to the rather equivocal answer of the jury to the fourth interrogatory, it may be remarked that it seems evident to us, that a negative answer was returned because the jury did not think a preponderance of the evidence showed that when the train stopped, the rear car thereof stood alongside of the depot platform. Upon this point, there was a conflict in the evidence; some of the witnesses testifying that the rear car stood alongside of the platform, and others that the rear end of that car had passed the northern end of the platform a very short distance. That the train did stop long enough for the plaintiff to have gotten off in safety, had he remained on until it was stopped, is

proven by the concurrent evidence of all the witnesses who testified on the subject, including both *Swift* and *Ford.* And we think the evidence that the train was stopped, pursuant to a regular signal given for that purpose previous to the time that *Swift* jumped off, renders that fact too clear to admit of serious doubt. On this point *Wyrick,* the engineer who ran the train, testified that the conductor signaled him, by a tap of the signal bell on the engine, to stop the train at *Amity,* when within about a quarter of a mile south of that place, and that he got no signal afterwards not to stop; that he shut off the steam as soon as he got the signal, and then gave the proper signal to the brakemen, and ran up to the station slowly, and that he stopped only because of that signal to do so; that when the engine passed the station it was running at the rate of from five to six miles per hour, and the engine stopped when near a trestle, between five hundred and six hundred feet beyond the station.

*Griffith,* who was the conductor of the train, testified as follows: "We stopped at *Amity* for passengers to get off. There were three, if not more, passengers to get off. One got on at *Edinburgh* and two at *Jeffersonville.* I signaled to the engineer to let passengers off, below the station, between a quarter and a half of a mile. The train stopped long enough for passengers to get off. * * * I stopped the train for no other cause than that I had passengers to let off." The testimony of these witnesses on this point is strengthened and corroborated by that of *Swift* himself, who testified that though "it was a very short space of time between *Ford's* jumping off the train and his own jumping off, yet his impression was that the train was not running so fast when he jumped as when *Ford* jumped, and that had he thought otherwise, he would not have jumped."

*Swain,* the railroad agent at *Amity,* who was present, testified that his impression was that the train, as it passed, was gradually stopping.

The only evidence even tending to cast a doubt upon the fact that the train was stopped in obedience to a signal given before it reached *Amity*, is that of witnesses who testified that they did not hear the signal bell or whistle.

*Ford*, whose deposition was taken and read in evidence by the plaintiff, stated that before reaching *Amity*, he told the conductor that he and *Swift* wished to get off at that place, and that the conductor made no reply; that he could not discover that the train made any halt when they reached *Amity*, but kept on at about half speed; that he heard no whistle as they arrived, and thought no effort to stop was made.

*Swift*, the plaintiff, as we have seen, testified that he did not recollect to have heard a whistle or the ringing of a bell.

*Dawson* testified that he was sitting in his store, about the middle, when the train passed near the store door; that he neither heard a whistle nor the bell, nor the approach of the train; the first he knew the train passed the store door; that "if a person," (situated as he was,) "is not interested particularly he might hear the train, but if his attention was drawn in conversation, or otherwise, it might pass and he not know it."

*Bruding*, in his evidence, stated that he heard the train coming and as it approached, he went out. Heard no whistle or bell. The bell might have been rung while they were approaching, but he did not hear it.

This evidence, so purely negative in its character, can scarcely be deemed worthy of serious consideration in opposition to the positive evidence of two unimpeached witnesses, whose duty it was to perform the service testified of, and especially when considered in connection with the fact that the signals testified to by the engineer and conductor, consisting of a single tap of the signal bell and two whistles of the engine to notify the brakemen, when made at the front of a train consisting of eight or ten cars, might not be heard or observed by persons in the rear cars of the

train, or by those inside of their shops or houses, at a distance of a quarter of a mile or more.

We assume, then, that the train did in fact stop at *Amity* long enough for passengers to leave the cars in safety, and that it was so stopped pursuant to regular signals, given for that purpose, as the train approached the station, and before the plaintiff jumped therefrom, and we think the jury, by their answer to the fourth interrogatory, did not intend to find to the contrary.

We have perhaps given to this question an unnecessary space, as, if the conductor did not intend to stop the train and let the passengers for *Amity* safely off, as was his duty to do, that fact, as we have already stated in a previous part of this opinion, did not justify the plaintiff in leaping from the cars while they were in motion.

Before referring to the instructions given by the court to the jury, it may be proper to state that the conductor in testifying in the case expressly denied being present when *Swift* jumped from the cars, or knowing at that time that he had so jumped, or was injured. He also as positively denied having had any conversation with *Swift* in relation to his jumping off the train. The fact that such a conversation occurred between them rests upon the evidence and statements of *Swift* alone. We do not, however, refer to this fact for the purpose of discussing the question of the preponderance of the evidence, or of veracity, as between these two witnesses. These were proper questions for the jury, whose answer thereto is found in their verdict. But we refer to it for the purpose of saying that we look to the evidence of *Swift* alone, for the purpose of determining what was said by the conductor on that occasion, as an inducement to *Swift* to jump from the cars while they were in motion. And in discussing the question as to the effect of the conduct of the conductor on the legal right of *Swift* to recover for the injuries complained of, we assume the facts in that respect to be just as they are testified to by *Swift*.

The case then stands thus: The train on which *Swift* was a passenger was stopped by the direction of the conductor at *Amity*, pursuant to the usual and proper signal given by the conductor before the train reached that station. *Swift* was informed by *Ford*, his traveling companion, that the train would not stop entirely, and that they must be ready to jump off when they reached the station. Laboring under that erroneous impression, they went to the front platform of the car they had occupied, and as the end of the car passed the station platform, *Ford* jumped off. *Swift*, feeling afraid, did not jump at that time, but immediately thereafter, seeing the conductor on the platform of that or the connecting car, without asking him if the train would be stopped, said to him, "Mr., I cannot make this risk." To which the conductor replied, as he, *Swift*, thought, in an irritated manner, "you could if you would," or "you might if you would," he was not certain which, but thought it was the former. And thereupon *Swift*, considering that he was an active man, and considering what the conductor had said, thought he would make a safe jump, and expected to land five or six feet from the cars; that he did jump, the cars at the time being in motion and running at a rate of speed not less than from five to six miles an hour, and as he thought from ten to twelve miles an hour. He jumped from the second step of the platform, and by jumping caused the injuries complained of. Another fact considered by him in making up his mind to jump, was that he thought the train was running at a slower speed than when *Ford* jumped, otherwise he would not have jumped.

Under this state of facts, we think the court erred in giving to the jury the sixth charge of the court. That charge is erroneous, if for no other reason, because it was well calculated to confuse and mislead the jury. It is in part based on the assumption that the plaintiff was laboring under the impresssion, derived from passengers and officers of the company, that the train did not stop at that

station. But there was no evidence, either proving or tending to prove, that the plaintiff had received any such information from the officers of the company. The only person from whom he claimed to have received such information was his traveling companion, *Ford;* while the latter, in his deposition, says nothing about having been so informed by any one, or of having made such a statement to the plaintiff. Again, it is said in the instruction, that "if he, the plaintiff, had been told by the defendant's conductor that it was safe to leap from the cars while in motion, and was told, advised or commanded so to leap," &c. We have already seen that all the plaintiff in his evidence claimed the conductor said to him was the single remark, made by him in response to the plaintiff's statement to him that he could not make that risk, "you could if you would," or "you might if you would." He did not tell him to leap, and the words used could scarcely, by a fair construction, be understood as advising him to leap, much less as a command to do so. The instruction, as a whole, is not fairly based on the facts of the case, as they were given in evidence before the jury. Instructions based on a hypothetical case, where the evidence does not tend to make the case supposed, are out of place, and ought not to be given, as they tend to mislead the jury. *Swank* v. *Nichols' Adm'r,* 24 Ind. 199.

But we think the instruction did not contain the law. It concludes by saying, that if with such assurance of the safety of the leap, and relying thereon, the plaintiff did jump, and was thereby injured, the defendant would be liable. The plaintiff was a man of mature years, and we must presume of at least common understanding. He claimed to believe that the train was running at the time at a speed of at least ten miles to the hour, and under these circumstances he must have known that such a leap was at least hazardous, too much so to require a practical knowledge to teach him the fact. The sense of sight would be sufficient to satisfy any one of sane mind of the danger in

such an act, and he cannot be permitted to claim that his own misconduct and want of care did not contribute to the injury resulting from his own voluntary act, by saying that he relied on the assurance of the conductor that it was safe so to leap.

The instruction does not base his right to recover on the ground that he was compelled or induced to jump from the train to avoid an apparently greater danger, or by the positive command of the conductor, but simply on the assurance of the conductor that it would be safe to do so, and without any other motive for the act than the fear of being carried beyond the station where he desired to stop; a fact that did not justify him in incurring the danger. Under such a state of facts, he was not compelled to the act, and therefore did it voluntarily. It was an extremely imprudent one, and fraught with dangerous consequences, and was the direct and immediate cause of the injury. Reasonable care required that he should have remained on the car, and thereby have avoided the injury, and therefore he could not recover under such circumstances.

If this view of the law be correct, it is apparent that the court erred also in refusing to give the second instruction, in terms, as asked by the defendant's counsel. It was fairly based on the evidence in the case, and involves the principle that if the plaintiff leaped from the cars when in motion, to avoid no other peril, inconvenience or damage than that, as he supposed, of being carried past the station at *Amity*, and if in so leaping off he acted partly by the advice of the conductor, and partly from his previously formed determination so to do, and from a belief that with his strength and activity he could make the leap safely, and the injury resulted therefrom, he could not recover. The state of facts presented in the instruction shows a clear case of mutual negligence on the part of the plaintiff and the conductor, contributing directly and materially to the injury, and which would prohibit a recovery by the plaintiff.

The substitute for the second instruction, given by the court, in effect, declares that to avoid a recovery, the plaintiff, in jumping from the cars, must have relied alone upon his belief in his own ability to do so in safety, and that if he was in part influenced to the act by the assurance of the conductor as to its safety, he could recover. This we think is not the law.

It is insisted by the appellee's counsel, that it was proved by the evidence of *Ricketts* and *Scott*, that the conductor said to the plaintiff, "jump, jump!" We do not so understand the evidence. On cross-examination of the plaintiff he was asked if, in conversation with *Ricketts* and *Scott*, he had not made certain statements to them in reference to the occurrence, materially different from those testified to by him on the trial. *Ricketts* and *Scott* were afterwards introduced by the defendant for the purpose of contradicting the plaintiff, and proving that he had made conflicting statements in reference to the occurrence. *Ricketts* testified that in a conversation with the plaintiff, after the injury, he asked the plaintiff why he jumped off the train? To which the plaintiff replied that he was traveling with a companion who jumped off; that he thought the train was not going to stop, and that he was not going to be left; that somebody, whom he took to be the conductor, said, "jump, jump, jump," and that he then jumped and got hurt. *Scott* testified that the plaintiff told him that when they got to *Amity*, "his son-in-law jumped, and some one said to him to jump, and he jumped and got hurt. He first said it was the conductor, and then said it was some person standing behind him that told him to jump. He said he did not know that it was the conductor, but that he supposed it was." In giving his own evidence in the case, the plaintiff did not testify or intimate that any person had said to him "jump." He gave what he claimed were the exact words used by the conductor, "you could if you would," or "you might if you would." And he cannot claim from the evidence of *Ricketts* and *Scott*,

introduced only to show his own contradictory statements, made out of court, that the conductor directed him to jump.

In concluding this opinion it may be proper to remark, that where a passenger leaves a train when in motion, and is induced so to do by a well grounded apprehension of peril to life or limb, as when a collision is about to happen, or the train to go down a precipice, resulting from mismanagement of the train, or the negligence of the railroad company, or its agents, and he thereby receives an injury, he may recover therefor, although it should appear that leaping from the train under such circumstances contributed to the injury, or was even the sole cause thereof. Redfield on Railways, § 151, p. 334; *Ingalls* v. *Bills*, 9 Met. (Mass.) 1; *Stokes* v. *Saltonstall*, 13 Pet. 181; *Frink* v. *Potter*, 17 Ill. 406. But whether a passenger of mature years and understanding, who leaps from a train in motion when no danger threatens, even by the order or command of the conductor, but without any threat of violent expulsion, can recover for an injury occasioned thereby, we do not determine. In *Sanford* v. *The Eighth Avenue R. R. Co.*, 23 N. Y., 343, it was said by COMSTOCK, C. J., that "a person cannot be thrown from a railroad train in rapid motion, without the most imminent danger to life; and although he may be justly liable to expulsion, he may lawfully resist an attempt to expel him in such a case. As the refusal of a passenger to pay fare will not justify a homicide, so it fails to justify any act which in itself puts human life in peril; and the passenger has the same right to repel an attempt to eject him, when such an attempt will thus endanger him, that he has to resist a direct attempt to take his life."

A passenger is not bound to leave the train when it is in motion at the command of the conductor. He may disobey such command with impunity, and may resist an effort made to enforce it; but when no threat of violent expulsion is made, and the passenger is still left in the free exercise of his will, and seeing and knowing the peril of the act, leaps from the train at the command of the conductor, and is

injured, can it be said that his own unnecessary and imprudent conduct has not contributed directly to the injury? We do not decide the question. The court below, for the reason stated, erred in overruling the motion for a new trial.

The judgment is reversed, with costs, and the cause remanded for a new trial, with directions that the demurrer to the first paragraph of the complaint be sustained, and for further proceedings, &c.

*T. A. Hendricks, S. E. Perkins, O. B. Hord* and *A. W. Hendricks,* for appellant.